Case will now come to, the court will now come to order in case number 514-0114 in the Marriage of Sommer. Counsel may proceed. Ms. Wood. Good morning, Your Honors. May it please the court. My name is Jillian Wood. I'm the counsel for petitioner appellant Mary Sommer in this case. As this court is well aware, this is an appeal from a judgment of dissolution of marriage that was entered by the trial court in this case on November 5th, 2013. Specifically, the trial court found that the total marital debt of the parties was $343,000, upon which this appeal was subsequently filed, addressing and arguing that the court's finding with respect to that amount was not only an abuse of the court's discretion, was against the manifest weight of the evidence, and also was additionally, and very significantly, was against the express terms of the parties' agreed order that was entered into on January 17th, 2013. The procedural history of this case is somewhat important. Obviously, we had three parties that were involved. There was a son, the intervener, Ryan Sommer, of which this court heard a prior appeal, prior to this appeal being initiated. There was, obviously, the petitioner appellant, Mary, and the appellee respondent, Michael Sommer, husband and wife. But some also had interest with respect to parts of the property of the parties. Specifically, this JD 9650 combine, which became a significant issue within the case. Of note, obviously, the procedural history in this case is extensive. The court is in possession of the record on appeal, which includes four volumes of the common law record, 12 to 13, I think, reports of proceedings, and then four volumes of exhibits. But specifically, and most notably, of significance in the record is beginning on January 17th, 2013, in which the parties had entered into an agreed order, basically, which provided as follows. That number one, all other issues between intervener, Ryan, and husband were reserved. Mary's petition for rule to show cause was reserved. Mary had received a written bid from Paul Patton to purchase some, but not all, of the real estate of the parties. Paul Patton was to submit a contract to counsel for Mary, subject to no contingencies except court approval, on or before February 8th of 2013, 5 p.m. In the event that neither party matched the bid and a non-contingent contract was tendered, the court was going to address the issue of acceptance of that contract on paragraph 9 on February 15th. And in the event that no contract was contemplated and received by the parties, in the event that they were interested in purchasing all of the real estate, equipment, livestock, and other assets and addressing all liabilities of the farm, shall appear on the February 15th, 2013 date with proof of non-contingent financing for their best and highest offer. In the event that both Mary and Mike desired to purchase the property pursuant to paragraph 11 here, the court shall determine order of bids and successful bidder at the hearing on February 15th, or whether the property should be sold at auction. Additionally, all other issues reserved, and then that matter was set for February 15th, 2013 at 10 a.m., for addressing those issues listed in paragraph 10, 11, and 12. Specifically, this order made no reference as to offers or other ancillary information other than it was specifically included in this order. So in other words, we had no idea at this time, there was no evidence taken, there were no exhibits entered at that time as to specific valuations of property or specific findings as to debt. The February 22nd hearing, which actually occurred a few days after that February 15th hearing, was of significant also note in the record. This hearing was held with the attorneys present. The parties were not actually present in the room. There was significant testimony. I guess if you say testimony, none of the attorneys were sworn, but there was testimony indicated by the attorneys as to what the offers were, what potential amounts of the debt were, and there was not any clarity from either the court or the attorneys specifically as to what the amount of the debt would be and how this debt would be addressed. The court vacillated back and forth to saying, okay, well, we're going to find it as this, but then we need to go back and challenge it at this time. And ultimately, that order that was entered on February 22nd, 2013, notably was not signed by the parties. It was not, the party signatures did not appear on that order, but did find that the issue of debt was going to be taken up at some point later in the litigation. The most significant thing that happened after that was obviously there was a motion for rehearing that was heard on April 8th of 2013, which the court did deny, and then there was a judgment of dissolving the parties' marriage on April 10th. Of note on April 8th, there was also an agreed order entered between husband and son, which basically resolved the issue of the combine, allowing son to basically buy out the combine. The significant issue, I think, going back to the February 22nd order, is that the court specifically found in that order, or specifically decided on that day, that son would be, basically his interest in this piece of property would be removed. In other words, we're going to award it to husband to allow him to execute his offer, what his best offer was. But let me kind of delve into that a little further. The husband was a cosigner, so he stuck with paying the debt on the combine if the son doesn't come up with it, correct? He was, yes. And it was in default, as I understand. That is correct. And the son had not come up with the financing that was anticipated and part of the agreed-to order. So what else could the court have done? Well, what the court could have done was simply allow, then, the parties to either, A, continue on to trial and decide and resolve the issue of the property issues with respect to the combine at the trial date, potentially allow the auction, which I know there was another option for the parties, to allow an auction to occur to allow the sale of all the merited property and the debt. Okay, so wasn't it agreed that my calculations showed that there was about a $38,000 difference between the agreed-to value of the combine and the money owed. Does that sound right? That does sound right. Okay, so didn't the court, then, divvy up that debt? No, the value, the difference was that the court, what the court did was consider the total value of the debt. So I think the court found that there was approximately $1.2 million in assets. Subtracting the $343,000 in debt brought that figure down to $900,000, of which the offer to marry at that time, which was communicated during that February 22nd hearing, was $450,000. In other words, half of the total value of the marital estate, so assets minus the debts. So that's the significance of the value of the combine. Well, the value may be less, obviously it was less than the total. You lost me then. Where does the combine figure into that? The combine figures in because the combine debt was included in that $340,000. It's a debt of approximately $106,000, $108,000 was the amount of that combine debt. So that debt that reduced the marital estate, the value of the marital estate, reducing it by that $343,000, included that $106,000, $108,000 that was in dispute with respect to this combine. So in other words, if the intention was to— But what is the dispute with respect to the combine? It was a marital debt, right? It was a marital debt, yes. And it was in the husband's name as well. So what is your beef with respect to the combine? The beef with respect to the combine is that the January 17th order that was agreed, that was agreed and entered into by the parties, did not say that Mary was, or did not agree that the issue of who owned this combine, who would be given this combine, who would ultimately be responsible for the debt, that was not agreed to as part of this order. It was not expressed. But it wasn't. What was agreed to is if the son wanted to buy it, he had to finance it by a particular date, and he wasn't able to do that. That was actually not part of the January 17th order. That was not what the son agreed to. That issue, the issue of the combine was actually specifically reserved. So what was supposed to happen on this February 22nd date was that husband and wife could come and they could potentially make offers to one another. Mr. Patton could come. He could potentially make an offer on a specific piece of the property. And the court may be able to decide whose bid may be best or better or whatever, or decide that everything was just going to be sold. I argue alternately the court could have just decided that we're going to save all these issues for trial because we have so many contested issues. But that issue of who was going to be awarded that combine was not agreed to in that January 17th order. There was no express term or no express statement saying that we're going to decide the issue of this combine. And by virtue of that, that will have an effect on the overall possible offers that the parties could make back and forth to one another. So in essence, when the court decided to award this piece of property to Michael, what it did was it basically bumped in there $106,000, $108,000 more worth of debt, thereby reducing the intention to give Mary half of that property, reduced the value of what she would have been given. Well, half of that property would have been what? Half of that would have been approximately, well, $154,000-some-odd additional that Mary, if the court had not made this combine, awarded that combine to Michael, ordered him to refinance the debt on that date. There's a potentially $54,000, I would say between $54,000 and $56,000 worth of additional equity out of the marital estate that should have been awarded to wife. So in other words, she was deprived from that amount. Okay, walk me through the math. When did you get the $56,000? So the debt on the combine was approximately $106,000, which is what everyone testified to. But it had value of $70,000. Correct, and that was included as part of the overall value of the marital estate. So the court had found on that date that the marital estate was worth approximately, or at least what Michael's attorneys argued, was $1.2. If you give me a moment, I can find the specific figure. So you're saying that she got all the debt of the combine. She got half of the debt of the combine. And so if I can clarify, because I know sometimes it's difficult.  Which included all the equipment, the cattle, everything. That was valued at the $1.2-some-odd million. It also included the debt, which included the combine debt as a separate figure. So we have the value here and then the debt is over here, which included the combine figure. But if it's a marital debt, she would be responsible for half of it because the combine was worth less than its value. But the issue with respect to this debt is that throughout this litigation, it was always the intent, and it was early in the common law record that was before the court, early on indicated that the entire intention always was for Son to have this combine. This was his combine. And he and Dad, Mr. Sommer, Michael Sommer, were in conflict about this combine throughout the entire litigation. They were still in conflict about it as of February 22nd. The issue was that. They were in conflict as to what? As to the combine. Son wanted the combine. Obviously, there were issues with payments on the combine. It was in foreclosure. They were still duking it out with respect to this particular combine. When you say they, though, the son and who? Son and husband. Okay. Yeah. I mean, Mary's position always was that the combine is Ryan's. It's Ryan's combine. So Ryan didn't come up with the refinance? Right. Ryan hadn't come up with it, but there was nothing in that January 17th order. So when we go to our first point on appeal, which was the express terms of that January 17th, 2013 order, there was nothing in that order saying that the court was going to decide who was going to get that combine and then who was going to get it. Well, he was legally owned it, though. The husband essentially legally owned it. So did Ryan, and that was the issue. Their both names appeared on the order. In order for him to be resolved of the debt, the husband, though, Ryan had to refinance it, and he didn't. But that was not specifically part of that January 17th order. In other words, the January 17th order didn't say. But they said if things weren't resolved, then the court had the right at the later time to essentially take care of all the assets and liabilities, and that was part of the liabilities of the total estate. With respect to – I would agree with Your Honor in that it's obviously the parties and the debts. The issue is, though, with respect to this particular debt, this combine debt, it was not contemplated and it was not part of that January 17th order that something – that Ryan had to do something before that date, the February date, in order for him to maintain an ownership interest in the combine. That January 17th order specifically stated that all other issues between intervener and defendant were reserved. So, in other words, that issue with respect to the combine was going to be reserved. It was not contemplated that it would be addressed at that February hearing. In other words, it wasn't contemplated, it wasn't expressed anywhere in the order that Mary could potentially receive $56,000 less of the overall marital estate because Ryan didn't get the combine refinance, and the court would subsequently award it to Mike. I'm not understanding your math, because if she is already on the hook for the $70,000, she gets credit for the $70,000 in value, and it's – your argument in the brief is $108,000 in debt that should not have been taken into account. The difference between $70,000 and $108,000 is $38,000, and half of that is not $54,000, but $23,000. Maybe my math is incorrect. It would be $19,000. $19,000. That's okay. We're lawyers, right? Thank you. Thank you, but it is a totally different number. It's only $19,000. I understand what the court is saying, and so I apologize. I see the math very clearly in my head sometimes when I do these cases. I see what the court is saying. In other words, you're reducing that debt, and when I talk about $56,000, I'm talking about you're taking that overall debt figure that's allocated between the parties. You're making a swing on that allocation of debt by $56,000 if you take out the combine. So, yes, the overall shift with respect to the division of the overall marital property and assets, the overall marital estate, may be less than that, but by taking that figure out, that actually has a substantial effect on what the overall distribution should have been. So in other words, keep that out, and with respect to those amounts, has that overall effect on the distribution, and that's a significant issue, obviously, that we've stated in our brief. Okay. Thank you, counsel. We'll have an opportunity for a rebuttal. Thank you. Thank you. Counsel, Ms. Desai? May it please the court. My name is Jamie Desai, and I represent the affiliate and respondent in the original action, Michael Sommer. Before I respond to Ms. Wood's arguments, I do want to bring one thing before the court. In reviewing for the oral argument today, I realized that my office inadvertently did not include a page of our brief in what was submitted to the court, so we will be filing a motion pursuant to Rule 361 to correct that, and my apologies for that. In responding to Ms. Wood's argument, counsel is correct that an agreed order was entered on January 17, 2013, and pursuant to case law, agreed orders are to be subject to contract interpretation, which means the intent of the parties is to be determined by the plain and ordinary meaning of the provisions of that agreed order. The plain terms of that agreed order were that Paul Patton was to submit a contract for purchase by February 8, 2013, at 5 p.m., subject to no contingencies for a portion or all of the real estate. If no offer was received by that deadline by Paul Patton, both parties have the opportunity to appear at the next court setting with their best and highest offers with proof of non-contingent financing, and the parties explicitly agreed to in the agreed order that their offers would be for all of the real estate, equipment, livestock, and other assets, and assessing all liabilities. I'll get to the combine later in my argument, but clearly the combine was equipment of the marital farm. It was used in the farm. Michael was a, he was on the debt for the combine, and I believe the title for it as well. But to continue on. The title, are you sure of that? Actually, I'm not sure of that. I just realized I said that. Will we have that in there? I don't believe, I haven't had an opportunity to review the exhibits yet because I don't think that they have been included, but I don't think that the title to the combine is in the, was submitted in evidence. In the page that is actually missing, though, from our brief, I did discuss the ownership of the combine and how it came, how the combine at issue here came to have both Michael and Ryan's names on the debt. Initially there was a previous combine that Michael owned on his own, which was then sold, and the proceeds of that were, I believe, about $15,000. Michael kept $5,000 from those proceeds and used the other $10,000 to buy, to purchase the combine at issue here. He couldn't secure a loan for the entire debt of the combine at the time, which is why Ryan co-signed the combine with him. So the court did consider that history of the combine ownership and also determined that it was a marital asset. Do you agree that that is essentially what's at issue here, is the appellant's contention that it's the combine and the debt on the combine that's at issue on appeal? I guess I think that the appellant's issue is the determination that the combine was marital debt, and I think what the appellant had argued in her brief was that the agreed order entered on January 17, 2013, did not provide for the trial court to address the combine at the February 22nd setting. However, the provision in the January 17, 2013, agreed order that was repeated, I believe, throughout the order was that the parties were to bring offers for all real estate, equipment, livestock, and other assets and assessing all liabilities of the farm. The combine was clearly an asset of the farm. You heard our discussion about the math. Do you agree that essentially $19,000 is what's at stake here? I was trying to check the numbers. I'm afraid I don't have those in front of me. I know that the combine was in debt for, I think, more than $30,000 than it was actually valued for. So I think applying those numbers, that would probably be accurate. Going back to the agreed order, Mr. Patton failed to meet his deadline in bringing forth any kind of contract for either all or part of the real estate by the February 15 deadline. The parties agreed to give him an additional week and reset the court setting for February 22nd. Mr. Patton still had not provided a formal contract at that time. He had provided an offer pursuant to a letter that was informal for part of the real estate. The only other offer at that court setting was Michael's offer for $1,243,000 for the entire farm, its assets, the equipment, and assessing all liabilities. For Michael to complete his offer, he would essentially be doubling his own debt and Mary would walk away with $450,000. It's also interesting to note that this is $5,000 higher than what Mary had previously offered to buy out Michael's interest but was unable to secure financing. Regarding the date and the date of that debt, the trial court of both attorneys at the February 22nd setting clarified that while the court was ruling on that date that Michael's bid was the best and highest offer and should be completed for the farm considering all the liabilities, the apportionment of those liabilities was what was reserved for final trial. There was discussion on the record by the attorneys regarding this. Mary's trial attorney at the time specifically asked that the parties be allowed to present evidence at trial if it was found that Michael's decision-making in running the farm had resulted in the accrual of unreasonable debt and, therefore, she should be assigned less than an equal amount of the debt on the farm as of the date of the sale or purchase by Michael. The trial court judge explicitly agreed and stated that as long as Michael made good, sound decision-making and had sufficient record-keeping to show where the money went, then it was going to be legitimate as far as the debt and legitimate debt would be equally apportioned between the parties. It's unreasonable now for Mary to argue that the court erred in limiting that debt assessed on the farm to the date of the sale. Even at trial, the list presented by both parties regarding the debts of the farm were particular to February 22nd, 2013. Getting to the combine now, at the February 22nd setting, the only attorney that objected to the court addressing the combine on that date was Ryan's attorney. Counsel for Mary never objected that the combine should not be addressed on that date. It's clear that a tractor owned by the parties, which Michael's name was on the debt, and also following the ownership from the previous combine that was used on the marital farm is a marital asset. The trial attorney for Michael stated that while it was everyone's intention and desire that Ryan take over the combine and its debt, he was clearly unable to, which resulted in the foreclosure proceedings. Michael's attorney stated at the setting that Michael couldn't refinance the farm and the debt until the combine was addressed. In order to honor the parties' agreement from the January 17th agreed order, the trial court assigned that debt to Michael, and he refinanced the farm debt with the combine and paid Mary the $450,000. The date of the valuation of the marital debt at the court setting on April 8th, 2013, which is where the trial court bifurcated the proceedings and entered a judgment of disillusion for the parties, it was explicitly stated on the record by both attorneys, in agree to by both attorneys on the record, that the judgment of disillusion would be entered and the proceedings would be bifurcated under the condition that three issues would be reserved. And one of those issues was the issue of the disposition of marital debt as of February 22nd, 2013, and that was explicitly stated on the record. The court also reserved the issue of future maintenance and attorney's fees. The only contention at that time from Mary was whether temporary maintenance would be evaded or would continue. The court's determination as of the debt on February 22nd was supported by the manifest weight of the evidence. Both parties submitted lists of the debts, and only Michael's list was actually supported by supporting documentation, was supported by his testimony as the farm bookkeeper and the testimony of the farm accountant. Many of the reported payments on debts from Mary's list were inaccurate and were not even payments on debts listed but actually payments towards other services and goods and supplies for the farm. The court relied on the most credible testimony and along with the supporting documentation to determine the farm debt. In response to also Mary's argument in her brief regarding the $9,500 debt to Citizens Bank for expert attorney's fees and determining fees, the courts did consider the allocation of assets and liabilities, maintenance awards, and earning abilities. And based on financial ability or inability, the court can determine the payment of fees, and such determination is completely within the court's discretion. The trial court here did not abuse its discretion in ordering that that be included as marital debt to be equally apportioned between the parties. I was somewhat confused by that, why he just chose that fee to assign as a marital debt. I mean, they both had attorney fees, they both had expert witnesses. I just didn't see any basis for that. Well, I believe that the reason that, so the Citizens Bank debt, Michael had taken out that debt in order to make the temporary maintenance payments to Mary throughout the proceedings. And then he also used funds from that debt for his expert and attorney's fees. The farm was secured, I believe on that debt, which is why it was being considered, which is why the court was taking a look at it when it considered the farm's debts as of February 22nd. I think looking at... So you're saying that if he had gone out and gotten a payday loan or something, the court wouldn't have, it wouldn't have been appropriate for the court to do that? Well, actually, Your Honor, as we stated in our brief, I do think it was appropriate for the court to order that the parties equally split that debt. Looking at the parties' incomes during the proceedings, Michael's gross income at the time, I believe the final trial was about $1,900 a month, and his expenses were in excess of $5,000 a month. Mary had just been paid a lump sum in the amount of $450,000. She was also receiving a little over $1,200 a month in disability, and she'd been receiving temporary maintenance payments throughout the proceedings in the amount of $1,500 a month. So during the proceedings, her total monthly income was $2,700. She was walking away from this marriage without any debt, and during the proceedings, Michael was only taking in $1,800 a month, which is why he had to acquire the debt in the first place. The trial court, looking at Michael's income history from 2009-2012, they averaged that his income was about $1,600 a month. It was unlikely that he would ever be able to pay off the debt he acquired through the judgment and disillusion proceedings, whereas Mary definitely has more opportunity to continue to grow her net worth, given that she had $450,000 in the black, and Michael doubled his debt. Considering that she would continue to grow that asset, and Michael would continue to probably fall more and more into debt, and that she received very high-value assets from the divorce. So what did he buy the farm and all the implements for? $1,000,000, I believe $243,000. Kind of makes you wonder why he would do that if he's only going to get, what, $1,800 a month? I think it's just been in their family for so many generations and years, or for so many years, decades, I believe. He didn't even work on it primarily, so it was where their home was, it was where he lived, it was where he got up and worked every single day. So that's my guess at that. But based on those factors and Michael's inability to pay the loan, the court didn't abuse its discretion in ordering that the parties split that. So for the foregoing reasons, we respectfully request that this court enter an order affirming the trial court's judgment in all respects. Thank you, counsel. Do we have a follow-up? I think Your Honor raises a very important point here, which is when we're talking about the gross income of Mr. Sommer, Michael, after we look at what his expenses are, I think it's a gross understatement by counsel as to what his actual income expenses are. Within this case, there were tax returns that were presented by the parties, and obviously this is a farming operation, which has significant income. Otherwise, if Mr. Sommer's debts per month exceeded $5,000 per month, I can't imagine a bank that would have financed the purchase and securing of all of this property. In looking at those tax returns, which are included in the exhibits, you will note that income loss statement with respect to the farming operations. And after the fact, if you take out all of the expenses of the farm, including depreciation, things like that, you do get down to that gross income figure of $1,600 per month. But that's, obviously, we're paying our expenses as we go. So I think it's a little bit of a misnomer to say that he's in debt by, you know, in excess of $4,000 per month. I don't think that that is at all accurate. Additionally, with respect to the issue of the attorney fee, which is our third claim on appeal, Mr. Sommer received the benefit of this farming operation. Obviously, he bought Mary out of her portion of this farming operation. So she got what her equity, assuming that, you know, we have this issue with the debt that's still outstanding in the farming operation. The idea was to give her 50% of the equity of this farming operation. But Michael got to keep the farming operation. He got to keep all of the equipment. He got to keep the income stream that he ignored from that, all of the benefits from this particular farming operation. So to say that he didn't receive some kind of benefit or that he was in some way in a worse position, he got exactly what he bargained for. That's what he wanted. He got all the debt. He got all the debt, too, but he also got all the value of the property, all of the income that comes from the farming operation, the crops, the, you know, the corn, the soybeans, the cattle, you know, all the heads of cattle that he, you know, routinely sold cattle. And that was another piece of his business. So all of the income that ignores from that benefit, he also received that, which allows him to pay the debts. If you look at the history of this case as well, the debts that they had, part of these debts that he had to refinance were debts that he was paying on a monthly basis. He was paying debts specific for farming loans, things like that. So there was enough income generated from this business that allowed him to pay recurring payments on these debts for this obligation on a monthly basis. So he has an absolute income stream. He got the benefit of his bargain that he got to keep the entire operation, all of that income stream. Granted, he did have to pay for the debts, although arguably he got out from underneath this combine debt, because Ryan ultimately took that debt, and so that was a debt that he didn't have to pay and also doesn't have the benefit of that piece of equipment as of when we were at the trial. But the issue with respect to the attorney fees is obviously what the evidence was that this $9,500 was not used to pay Mary's maintenance. If the court looks at this record, there are multiple motions for contempt that were on file with respect to Michael's failure to pay maintenance during the pendency, the litigation. This was not used to pay Mary's maintenance. This was used to pay Michael's attorney fees and expert fees. And there is a contradiction in the court's judgment, wherein the court basically says, we're assigning this, it's just a blip on the radar, the $9,500. You already got your $450,000. This is a blip on the radar. We're going to assign this to you anyway. We're not going to consider it a marital debt, even though you've ignored no benefit from it. And additionally, there's a contradiction in that the court subsequently orders that neither party is going to pay the attorney fees of the other. So on the one hand, you can't say that you're not going to pay the attorney fees of the other party, but then order that this debt is somehow a marital debt, which Mary received absolutely no benefit, and clearly the maintenance was not paid from this. This was specifically looking at the evidence for his attorney fees and his expert fees. I wanted to pick up on something that counsel said briefly with respect to our second point on appeal, the valuation of specific debts. There was specific evidence presented. The documentation was presented in Petitioner's Exhibit 2 at trial with respect to those values of specific debts. And the Johnson case is really, I think, on point with respect to that, looking at specific values when evidence is given as to specific values. And remember, as of the February 22nd court date, these parties were still married, so everything that was being paid on those debts was marital debt. The court listened to testimony not only of your client and her client, but the bookkeeper with respect to the farming and operation debts. And don't you think that's a credibility determination? If I recall correctly, Your Honor, the bookkeeper actually didn't testify as to the debts that were in place as of February 22nd. The bookkeeper primarily testified as to the income flow of the farming operation, showing one of the major issues here also was the court said that Mary was in need of maintenance. Maintenance was a significant issue, and so a significant amount of the expert's testimony was about the income stream and the income flow related to the farming operation. So what other debts are you talking about? And, Your Honor, I apologize. Those debts are listed in our second point on appeal. There was conflicting information as to those values. That is laid out in that second point on appeal, and I can direct the court to that. Thank you, counsel. Thank you, Your Honor. The court will take this matter under advisement together with the appellee's oral motion and the appellant's motion to supplement the record, all with the case. Court will be in recess until the next case set at 11. All rise.